IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, et al., Plaintiffs, v. UTE DISTRIBUTION CORPORATION, et al., Defendants. | **MEMORANDUM DECISION AND ORDER** Case No. 2:06-cv-557 CW Judge Clark Waddoups |

## INTRODUCTION

This matter is now before the court on cross motions for summary judgment. The plaintiff, the Ute Indian Tribe of the Uintah and Ouray Reservation (the "Ute Tribe"), seeks to have the court declare invalid amendments that were made to the Articles of Incorporation of the Ute Distribution Corporation (the "UDC"). The UDC is a non-profit, Utah corporation that was organized to manage and distribute assets that are held by the Ute Tribe and the former members of the Ute Tribe now referred to as "mixed-bloods." The original shareholders of the UDC were all mixed-bloods, although some of the shares have since been transferred to others, including the Ute Tribe. Approximately 70% of the UDC shareholders voted in favor of the amendments. The Ute Tribe, which now holds approximately 20% of the UDC shares, opposed the amendments.

The main amendment in dispute precludes Ute tribal members and Ute tribe employees and agents from being on the UDC Board of Directors. The Ute Tribe contends the amendment

disenfranchised them. It also asserts that the amendment created two classes of stockholders, and that it should have been permitted to vote its stock as a separate class. Because whether the amendments are valid is a matter of law and because the amendments are reasonable and did not disenfranchise the Ute Tribe or create a separate class of stockholders, the UDC and the individual defendants' motion for summary judgment is granted[1] and the Ute Tribe's motion is denied.

## FACTUAL BACKGROUND

**Ute Termination Act**

In 1954, Congress passed the Ute Termination Act, which the parties refer to as the "Partition Act." Under the act, a number of individuals who had historically associated themselves with the Ute Indians were terminated from membership in the Ute Tribe and from federal services because they lacked a sufficient quantity of Ute Indian blood or had not declared the amount of their blood. These individuals are referred to as "mixed-bloods."[2] Congress also specified that all assets of the Ute Tribe were to be divided and distributed between the mixed-bloods and the full-bloods. Mixed-bloods received 27.16186% of the assets and full-bloods received 72.83814%, based on what their respective ratios were in the tribe.

Some assets were "not susceptible to equitable and practicable distribution."[3] The assets in this category included primarily oil/gas/mineral rights and hunting and fishing rights, but also other

---

[1] The individual defendants are Lois Larose, Charles Denver, Lynn McLure, Pala Nelson, and Rebecca Curry. They have been sued individually and in their official capacities as board of director members.

[2] Ute Tribe, Utah; Disposition of Interest in Tribal Assets by Mixed-Blood Indians, 25 Fed. Reg. 7620, § 243.20(b) (Aug. 10, 1960) (Docket No. 118, Ex. 4).

[3] Partition Act, 83 Pub. L. No. 83-671, § 10 (Aug. 27, 1954).

-2-

assets. Congress specified that the non-divisible assets were to remain in trust with the Department of Interior and be jointly managed by the Ute Tribe's Tribal Business Committee and the mixed-bloods' authorized representative.[4] The UDC was formed to be the mixed-bloods' authorized representative and ten shares of the UDC stock were distributed to each of the original 490 mixed-bloods. Until 1964, the UDC shares could not be transferred, unless first offered to a full or mixed-blood tribal member.[5] After this provision expired, the Ute Tribe itself started purchasing shares. Although the parties dispute the percentages of shares of the UDC now owned by various groups, the difference is not material to the resolution of the issues raised by these motions. Based on the different figures offered by the parties, the mixed-bloods and their descendants hold between 36.5% and 51% of the stock, while the Ute Tribe holds about 20%. The remainder is held by "whites," including trusts and banks.

The UDC's original Articles of Incorporation states it was organized "*on behalf of said mixed blood members* for the purpose of managing jointly with the Tribal Business Committee . . . all unadjudicated or unliquidated claims against the United States, all gas, oil and mineral rights of every kind, and all other assets not susceptible to equitable and practical distribution."[6]

**Conflict Between Full Blood and Mixed-Blood Members**

Since the UDC's organization, the parties have been jointly managing the indivisible assets. The effort of joint management, however, has resulted in controversy and disagreement. Evidence

---

[4] *See id.*

[5] Articles of Incorporation of Ute Distribution Corporation, Art. VIII (Nov. 13, 1958) (Docket No. 118, Ex. 2) (hereinafter "Articles of Incorporation").

[6] *Id.* at 1(emphasis added).

has been produced to show that the Ute Tribe is hostile and has animosity towards the UDC. It has sought to limit the hunting and fishing rights of mixed-bloods and their children. Although a three-judge panel (Judges Jenkins, Greene, and Winder) issued a preliminary injunction against the Ute Tribe related to these issues,[7] problems have persisted. Moreover, the Tribal Business Committee has excluded the UDC from participation with the "Big Game" planning and opportunities to provide comments on Big Game Regulations. All parties view these rights as important rights to preserve their cultural heritage and there has been disagreement over the enforcement of game laws and their application to mixed-blood descendants.

The UDC asserts it also has been excluded from negotiations regarding oil/gas/mineral leases. This fact is in dispute between the parties. The Ute Tribe cited to deposition testimony of Lynn McLure, the President of the UDC. McLure testified that usually there have been no problems with the UDC participating in oil/gas/mineral lease negotiations, and that he did not think there was any problem in how the assets were being managed.[8] The Ute Tribe also cited to a previous complaint filed by the UDC, wherein the UDC stated they had participated jointly with the Ute Tribe in negotiating and executing leases.[9]

A review of that complaint, however, shows the facts asserted in it are consistent with the facts that the UDC has asserted in this case. Although the UDC historically has been allowed to

---

[7] Findings of Fact, Concl. of Law, and Prelim. Inj., *Ute Distrib. Corp. v. Ute Indian Tribe*, No. 85-c-569J (D. Utah Aug. 31, 1990) (Docket No. 117, Ex. 13, Attach. A).

[8] Deposition of Lynn McLure, 12:11–19, 25:10–13 (Nov. 6, 2008) (Docket No. 118, Ex. 11).

[9] Complaint, *Ute Distrib. Corp. v. United States*, No. 2:04-cv-00199 (D. Utah) (Docket No. 1).

participate in negotiating and executing leases, more recently the UDC was excluded from participating in the UTE/FNR Agreement. Instead, the Superintendent of the Bureau of Indian Affairs signed on behalf of the UDC. The UDC has been given no meaningful opportunity to participate in the determination of the compensation structure nor the obligations that the agreement imposed on it for research[10] and indemnity. The dispute over this issue resulted in the UDC asserting claims in a lawsuit that was later dismissed voluntarily without prejudice. Nevertheless, the evidence supports that the UDC has been excluded from or limited in important negotiations related to assets that it jointly owns.[11]

Because the Ute Tribe owns the land, it controls access to the oil/gas/mineral exploration and has asserted its right to control access to influence and direct the management of these assets. The Ute Tribe has argued that the UDC merely has the right to a share of any royalty payments. The Superintendent agreed with the Ute Tribe when he signed the UTE/FNR Agreement on behalf of the UDC. This issue continues to cause controversy and disagreement over the management of the assets. The UDC correctly argues that receiving approximately 27% of a royalty payment is different than having 27% ownership of an asset. The disagreement over this issues demonstrates the continuing conflict between the parties' interests.

In addition to oil/gas/mineral rights, and game and fishing rights, the UDC's management duties also include managing jointly with the Ute Tribe all unadjudicated or unliquidated claims

---

[10] The UDC asserts the Research Agreement potentially imposes a $600,000 cost on the UDC.

[11] This fact is even more disturbing because the Ute Tribe may also have held an interest in the UTE/FNR, LLC to maximize its profits.

against the United States. In 1916, the United States took 84,000 acres of the Ute Tribe's oil-rich land without compensation and placed them in the Navel Oil Reserve. At the time of the Partition Act in 1954 this was an unadjudicated claim against the United States. In October 2000, the United States returned the land to the Ute Tribe in fee simple. The Ute Tribe refuses to acknowledge that the UDC may have an interest in the land, but the UDC is precluded by the doctrine of sovereign immunity from pursuing an action against the Ute Tribe. The disagreement over this issue is yet another fact that demonstrates that the interests of the UDC and the Ute Tribe are not aligned on important issues for which the UDC is charged to jointly manage.

The parties also have had disagreement over water rights. The UDC filed an action against the United States to address the allocation of water rights between the Ute Tribe and the UDC. The trial court ruled in favor of the Ute Tribe and against the UDC.[12] The appellate court affirmed on the alternative ground that the UDC's action was untimely.[13] The parties' interest were adverse to one another on this issue, even though the UDC was again precluded by sovereign immunity from suing the Ute Tribe directly. The UDC argues that if a member of the Ute Tribe were allowed to sit on the UDC Board of Directors, he or she would be privy to discussions about lawsuits, the UDC's strategies, and any other information that may come from future lawsuits.

Finally, the UDC has presented evidence that the Ute Tribe has in the past terminated employees when they disagreed with the Tribe's position and that the Tribe makes it difficult for

---

[12] Memorandum Opinion & Order, *Ute Distrib. Corp. v. Babbit*, No. 2:95-cv-376 (D. Utah June 2, 2008) (Docket No. 283).

[13] See *Ute Distrib. Corp. v. Sec'y of the Interior of the United States*, 584 F.3d 1275 (10th 2009).

them to be rehired. The UDC argues that such actions would make it difficult or practically impossible for tribal members and employees to provide impartial and unbiased advice were they allowed to serve on the UDC board. The UDC also has presented evidence that the Ute Tribe has expelled members from its own council if the council members disagree with the Tribe's financial planning and that numerous recall petitions have disrupted the council's ability to govern effectively. The UDC desires to avoid this type of disruption by requiring "cause" to remove a director from the UDC board.

In sum, the evidence supports that the Ute Tribe and the UDC have on-going and serious conflicting interests. Both seek to maximize their respective interests in the assets that are jointly managed. There are disputed issues of fact about whether the position of the UDC or the Ute Tribe is correct, but it is not necessary to decide which position is correct in order to resolve this motion. It is sufficient that the conflict exists, and there is no dispute that there is conflict. Neither the UDC nor its mixed-blooded shareholders have representation on the Tribal Business Committee and thus have no legal status in the tribe's governance. Because the Ute Tribe is a sovereign, the UDC is precluded from legally challenging actions taken by it that do not fall within an exception to the sovereign immunity doctrine. Thus, while the Ute Tribe is fully represented in the management of the joint assets through the Tribal Business Committee, the UDC which is charged to represent the interests of the mixed-bloods, only has representation through the UDC. The UDC argues that allowing members of the Ute Tribe to sit on the UDC board would undermine the UDC's role in administering the assets on behalf of the mixed-bloods because tribal members have opposing and conflicting interests. To address these concerns, the UDC shareholders adopted the following three amendments to the UDC Articles of Incorporation which the Ute Tribe challenges in this action.

**Amendments to the Articles of Incorporation**

The first amendment modified who may exercise corporate power ("Amendment One"). The second amendment specified that shareholders may only remove a board member for cause ("Amendment Two"). The third amendment changed the qualifications for serving on the board ("Amendment Three"). The already existing text of the Articles of Incorporation states: "The manner of election of said directors shall be by ballot *with each share of stock entitled to one vote*. Votes for fractions of a share shall not be allowed."[14] Amendment Three added the following language:

> Because the primary purpose of this corporation is to jointly manage certain assets with the Tribal Business Committee of the Ute Indian Tribe of the Uintah and Ouray Reservation, it is critical for all members of the Board of Directors to remain independent from the Ute Indian Tribe and free to vote on all matters in the best interest of this corporation and its shareholders. As a result, (i) no enrolled member of the Ute Indian Tribe, (ii) no person employed in a full-time or part-time capacity, with or without compensation, by the Ute Indian Tribe, and (iii) no person serving in a consulting or advisory capacity, whether directly or indirectly, paid or unpaid, on a full or part-time basis to the Ute Indian Tribe shall be nominated, voted upon, or eligible to serve as a member of the Board of Directors. ...[15]

Amendment Three is the primary focus of the challenge by the Ute Tribe to the amendments[16] and will be the primary focus of the court's discussion.

---

[14] Proposed Amendments to Articles of Incorporation, Art. VIII (Docket No. 118, Ex. 8) (emphasis added).

[15] *Id.*

[16] During the 30(b)(6) deposition of the Ute Tribe, it admitted that the Ute Tribe had no major objection to the first or second amendment. Deposition of Irene Cuch, 23:20–24:19 (Nov. 4, 2008) (Docket No. 117, Ex. 4).

## ANALYSIS

**I. STANDARD OF REVIEW**

Summary judgment is appropriate if the moving party shows "that there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law."[17] It is not sufficient merely to show a fact is disputed to defeat summary judgment. Instead, a party must show the fact is material. "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law."[18] Importantly, whether a corporation's governing documents are reasonable "is a question of law that is properly decided by the court on summary judgment."[19]

**II. AMENDMENT THREE - CORPORATE LOYALTY**

It has been well established for more than a century that a person's election to a board could be vacated because the person had conflicting interests or could not act with complete loyalty to the corporation to which he owed a fiduciary duty.[20] In addressing the issue in *Cross*, the court first observed that corporate by-laws, rules, and regulations may be amended at any time by vote of the stockholders.[21] The court then posed a question: "Can not the stockholders require that the important functions of directors . . . be performed not by enemies—those hostile in their interests

---

[17] *Student Mktg. Group v. College P'ship*, 247 Fed. Appx. 90, 95 (10th Cir. 2007) (citing Fed. R. Civ. P. 56(c)) (quotations omitted).

[18] *Id.* (quotations and citation omitted).

[19] *Central Kan. Credit Union v. Mut. Guar. Corp.*, 102 F.3d 1097, 1108 (10th Cir. 1996) (citations omitted).

[20] *See Cross v. West Va. Cent. & P. Ry. Co.*, 16 S.E. 587 (W.Va. 1892).

[21] *Id.* at 587–88.

to the company's best interests?"[22] The court continued that board members have access to confidential information about the company, which may be used against the company by a person adverse to their interests.[23] Moreover,

> A person can not serve two hostile and adverse masters without detriment to one of them. A judge can not be impartial if personally interested in the cause. No more can a director. Human nature is too weak for this. Take whatever statute provision you please giving power to stockholders to choose directors, and in none will you find any express prohibition against a discretion to select directors having the company's interests at heart. . . . The owners of the franchise and property of the corporation—the stockholders—ought to be accorded this power to defend their own interests.[24]

This principle is recognized in modern law and is inherent in the statutes providing for the recognition of corporations. Utah statute specifies that a director must be a natural person who is at least eighteen-years-old.[25] In then states, however, that the corporation's "bylaws may prescribe other qualifications for directors."[26] Although this provision refers to bylaws, it applies with equal force to the articles of incorporation. The statute makes express the right of the shareholders of a corporation to impose eligibility restrictions on directors. The right to impose eligibility restrictions protects not only the ability to require qualifications for age, education, experience and knowledge suitable to advance the purpose of the corporation, but also the ability to require that directors not be constrained by relationships that call into question their ability to exercise complete loyalty and

---

[22] *Id.* at 588.

[23] *Id.*

[24] *Id.*

[25] Utah Code Ann. § 16-6a-802(1) (2009).

[26] *Id.* § 16-6a-802(2).

fidelity to the corporation and shareholders they have been elected to serve.

The application of this principle is manifest in *Tu-Vu Drive-In Corp. v. Ashkins.*[27] In that case, after the stock was issued, the corporation imposed restrictions on the sale or transfer of stock. The restriction required a stockholder to first offer the shares to other shareholders, and then to the corporation, before it could sell them to an outside party.[28] One stockholder, who owned 39% of the shares, opposed the restriction, claiming she had "a vested right to retain her shares free of restrictions upon alienation."[29] The court disagreed, reasoning that while a corporation's governing laws cannot "unreasonably deprive the shareholder of 'substantial rights,'" the governing rules served "an important function" to preclude "unwanted intrusions by outsiders."[30] The court further noted that "bylaws are necessary for the protection of the corporation and its stockholders against rivals in business or others who might purchase its shares for the purpose of acquiring information which might thereafter be used against the interests of the company."[31] The plaintiff's rights were "innocuous and insubstantial" in comparison.[32] In the *Tu-Vu Drive-In* case the corporation was a closed corporation, but the principles expressed are not limited to such entities.

---

[27] 391 P.2d 828, 829 (Cal. 1964).

[28] *Id.*

[29] *Id.*

[30] *Id.* at 830 (quotations and citations omitted).

[31] *Id.* (quotations and citations omitted).

[32] *Id.* (quotations and citations omitted). Another stock restriction case also found the restriction reasonable. The court said such a restriction was "laudable" because it helped "prevent the stock from falling into the hands of people uninterested in Mexican-American culture." *Sanchez v. Centro Mexicano of Sacramento*, 1 Cal. App. 3d 756, 759 (Cal. Ct. App. 1969).

The fact that the principle is not so limited is evident in *McKee & Co. v. First National Bank.*[33] In that case, a plaintiff asserted that a national bank changed its by-laws for the express purpose of excluding a plaintiff's nominees from serving on the board of directors. The court noted that qualification restrictions are permissible "so long as [they are] not inconsistent with other provisions of the law."[34] One should look to general corporate law for this guidance. "The authorities on corporate law and the case law are unanimous in support of the proposition" that a corporation has "power to adopt bylaws imposing reasonable qualifications for service on the corporation's board."[35]

The court then referred to the *Tu-Vu* case and stated that even though that case involved a closed corporation, the law stated therein recognized "legitimate corporate interests."[36] Thus, it is permissible for a corporation to "require that directors not have interests which may conflict with the interests of the corporation."[37] This extends to "an officer, agent, employee, attorney, or trustee in any other firm, company, or association which competes with the subject corporation."[38] Individuals with such a conflict pose a danger even of "inadvertent leakage of confidential information through casual office discussions or accessibility of files."[39]

---

[33] 265 F. Supp. 1, 5 (S.D. Cal. 1967).

[34] *Id.* at 5.

[35] *Id.* (quotations and citations omitted).

[36] *Id.* at 6.

[37] *Id.* at 7.

[38] *Id.* (quotations and citations omitted).

[39] *Id.*

Moreover, when bylaws merely restrict a shareholder's "*choice of nominees[,] there is no disenfranchisement as alleged.*"[40] Instead, they must merely "vote for persons qualified to hold the office."[41] Indeed, "the same limitation may be said to be placed on every qualified voter." The court then discussed with approval the *Cross* case mentioned above.

In this case, the UDC has presented substantial evidence supporting a rational concern that there have been and continue to be conflicts of interest between the Ute Tribe and the UDC. It is not important to the resolution of this case to determine who or if anyone is right in those disputed issues. The fact that there is and has been an ongoing dispute is enough to support a reasoned conclusion that the shareholders of the UDC can adopt amendments that are designed to prevent such controversy from affecting the management decisions of its board. Moreover, it is evident from the record that the potential for such conflicts is inherent in the different interests of the shareholders of the UDC and the Ute Tribe. That potential for conflict is sufficient support to allow the amendments to survive the challenge made by the Ute Tribe. It is therefore reasonable for the UDC to adopt restrictions in its articles that exclude tribal members, employees, and agents from serving on the board.

The Ute Tribe's argument that such an exclusion disenfranchises the Ute Tribe itself cannot withstand scrutiny. First, the Ute Tribe itself it is not a natural person and was never permitted to be on the board, either under the original articles or under the Utah statute.[42] Moreover, the

---

[40] *Id.* at 6 (emphasis added).

[41] *Id.* at 8.

[42] *Compare* Articles of Incorporation, Art. IX (Docket No. 118, Ex. 2), *with* Proposed Amendments to Articles of Incorporation, Art. VIII (Docket No. 118, Ex. 8); *see also* Utah Code

amendment does not limit or prescribe the rights of the Ute Tribe any differently than any other shareholder. The Ute Tribe continues to have the same right to nominate and vote as every other stockholder. Requiring persons nominated by any shareholder to meet qualifications does not disenfranchise those shareholders who do not meet the requirements. By analogy, it would strain reason to suggest that a qualification requiring a nominee for the board to have a college degree would disenfranchise all shareholders without a college degree. As long as the qualification is reasonably designed to promote the legitimate purpose of advancing the best interests of the corporation and does not violate other laws, such as a restriction on race or national origin,[43] principles of corporate governance must allow the shareholders to make decisions about who will best protect their interests. In this case the UDC has amply demonstrated that the amendments satisfy this requirement.

The Ute Tribe's argument that the amendments must be voided because they create two classes of stockholders fairs no better. The UDC articles create a single class of stock. All shareholders enjoy the same right to vote on all issues. The UDC does not present a situation where the corporate structure includes different classes, such as common and preferred shares. In such a case the Utah statute precludes one class of shareholders from voting on changes to the corporate structure that would diminish the rights of the other class without allowing that class of shareholders

---

Ann. § 16-6a-802(1) .

[43] Initially, the Ute Tribe alleged racial discrimination based on 42 U.S.C. § 1981. Subsequently, however, the Ute Tribe voluntarily dismissed this claim. Persons who have 100% Ute blood may be a member of the UDC's board as long as they are not enrolled members, employees, or agents of the tribe. Amendment Three therefore does not impermissibly discriminate based on race.

-14-

to approve the change. That circumstance does not exist here. The changes affect all shareholders equally. A particular mixed-blood shareholder, for example, may believe a member of the Ute Tribe would best represent his or her interests on the board. The amendments preclude such a shareholder from nominating that person just as it does the Ute Tribe. Because the amendment does not limit or restrict the voting rights of the Ute Tribe differently than other shareholders of the UDC, they do not create a separate class of shareholders. The Ute Tribe's argument that the amendments must be voided are rejected; the Ute Tribe had no right to vote its stock as a separate class when the amendments were presented.[44]

## III. OTHER AMENDMENTS

### A. Amendment One

The Ute Tribe also challenges Amendment One. Previously, the Articles of Incorporation stated, "[t]he Board of Directors shall exercise the corporate powers of the corporation."[45] The amendment deleted that text and inserted the following:

> The exercise of the corporate powers of this corporation shall be vested *exclusively* in its duly elected Board of Directors. The stockholders shall not exercise any corporate power unless requested to do so in a written resolution adopted by the Board of Directors and submitted to the stockholders for approval.[46]

---

[44] The UDC asserted the Ute Tribe had no standing to challenge Amendment Three. As discussed above, the Ute Tribe is not qualified and has never been qualified to serve on the UDC's board. Consequently, the Ute Tribe was challenging the amendment not for itself, but on behalf of tribal members, employees, and agents. The court does not reach the issue of standing, however, because the challenge to Amendment Three has been resolved on other grounds.

[45] Articles of Incorporation, Art. X (Docket No. 118, Ex. 2) (emphasis added).

[46] Proposed Amendments to Articles of Incorporation, Art. IX (Docket No. 118, Ex. 8).

Because the amended text states the exercise of corporate powers is vested exclusively in the Board of Directors, the Ute Tribe contends this removed shareholder power. The court disagrees.

Although the prior articles did not contain the word "exclusively," the fact that the Board had exclusive authority is inherent in the text because no other person, position, or entity was listed as having *any* authority to exercise corporate powers. Consequently, adding "exclusively" to the text did not remove a right that the shareholders previously had. In fact, the amendment actually gave shareholders authority that they did not previously have. Under the new amendment, the Board of Directors may delegate the exercise of a corporate power to the stockholders, if such delegation is approved by the stockholders. Thus, the amendment expanded rather than diminished stockholder power. The amendment was therefore permissible.

### B. Amendment Two

As stated above, Amendment Two pertains to the removal of board members by shareholders. Previously, the Articles of Incorporation stated:

> The stockholders may remove any member of the Board of Directors by a two-thirds (2/3) vote of the stock represented at any annual meeting of the stockholders or at any special meeting thereof called for that purpose.[47]

This meant that board members could be removed with or without cause. Because of concerns that the Ute Tribe may disrupt the Board by seeking removal of board members without cause, the UDC amended the Articles to state board members may only be removed for cause. The four areas that constitute "cause," include: (1) failure to attend three or more board meetings, (2) conviction of a felony, (3) judicial declaration of incompetence, and (4) failure to continue to meet qualifications

---

[47] Articles of Incorporation, IX (Docket No. 118, Ex. 2).

for a board position.[48]  Amendment Two also specifies:

> Removal of a member of the Board of Directors for cause shall require a two-thirds (2/3) vote of the stock represented at any annual meeting of the stockholders or at any special meeting thereof called for that purpose.[49]

Thus, the UDC retained the remaining requirements for removal of a board member.

The Ute Tribe contends Amendment Two entrenches the board contrary to law because stockholders are limited in removing directors. This is incorrect. Section 16-6a-808(1)(a) of the Utah Code states that bylaws[50] may "provide that directors may be removed only for cause."[51] It is therefore permissible to require cause before shareholders may remove a board member. Moreover, the Articles of Incorporation specify that board members only hold office for five years.[52] This means stockholders may elect new board members every five years, even if they could not remove a board member for cause. Thus, the court concludes Amendment Two does not impermissibly entrench board members.

## IV. BUSINESS JUDGMENT RULE

The Ute Tribe also alleges in the complaint that the UDC directors are liable for their actions in proposing the amendments to the UDC articles because they breached a covenant of good faith

---

[48] Proposed Amendments to Articles of Incorporation, Art. VIII (Docket No. 118, Ex. 8).

[49] *Id.*

[50] Although the code refers to bylaws, the same rule would apply to articles of incorporation because the focus of this provision is on corporate governance and not where the requirement must be stated.

[51] Utah Code Ann. § 16-6a-808(1)(a) (2010).

[52] Proposed Amendments to the Articles of Incorporation, Art. VIII (Docket No. 118, Ex. 8).

-17-

and fair dealing. That claim also fails. "Generally, the decisions of directors are presumed to be informed, made in good faith, and believed to be made in the best interest of the company."[53] "This presumption is known as the business judgment rule."[54] Typically, the rule applies when board members take an action. Here, the board merely proposed an action that could not be carried into effect absent shareholder approval. Even if amendments were adopted solely by the board, however, case law recognizes that the business judgment rule applies to the circumstances presented in this case.

In rejecting the same argument made by the Ute Tribe here, the court in *Central Iowa Power Cooperative* stated: "the decision here to amend and tighten the qualifications for membership to the board of directors fits squarely within the protections afforded by the business judgment rule."[55] When qualifications are tightened to ensure a director will "do what is good for the [corporation] and all of its members, not just one particular member," this is "both reasonable and prudent."[56] Moreover, "[t]his justification is precisely the type of decision that is protected from second-guessing by courts."[57] Accordingly, the UDC also is entitled to summary judgment on this issue.

## CONCLUSION

For the reasons stated above, the UDC's motion for summary judgment is **GRANTED**. The

---

[53] *Cent. Iowa Power Coop. v. Consumers Energy*, No. 7-402/06-1060, 2007 Iowa App. LEXIS 988, at *8 (Iowa Ct. App. Sept. 19, 2007) (citation omitted).

[54] *Id.* (citation omitted).

[55] *Id.* at *9.

[56] *Id.* at *9–10 (quotation and citation omitted).

[57] *Id.* at *10.

motion of the individual defendants, board of director members Lois Larose, Charles Denver, Lynn McLure, Pala Nelson and Rebecca Curry, in their individual and official capacities, is **GRANTED**. The motion for summary judgment of the Ute Tribe is **DENIED**.

DATED this 12th March, 2010.

BY THE COURT:

_____
Clark Waddoups
United States District Judge